UNITED STATES DISTRICT COURT
EASTERN DIVISION OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LOUIS C. JONES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No.  4:05CV01790 JCH |
| | ) | (FRB) |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Respondent. | ) | |

**REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

This matter is on appeal for review of an adverse ruling
by the Social Security Administration.  All pretrial matters were
referred to the undersigned United States Magistrate Judge pursuant
to 28 U.S.C. § 636(b) for appropriate disposition.

**I.  Procedural Background**

On October 16, 2003, Louis Jones ("plaintiff") filed an
application for disability benefits pursuant to Title XVI of the
Social Security Act, 42 U.S.C. §§ 1381, *et seq*.  (Tr. 57-58.)
Plaintiff alleges that he became disabled as of January 1, 2001 due

---

[1]Michael J. Astrue became the Commissioner of Social Security on
February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil
Procedure, he shall be substituted for Acting Commissioner Linda S. McMahon,
and former Commissioner Jo Anne B. Barnhart, as defendant in this suit.  No
further action need be taken to continue this suit by reason of the last
sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

to a below-the-knee left leg amputation, epilepsy, and back pain. (Tr. 65.) The Social Security Administration denied plaintiff's application on March 12, 2004, and plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 29-34.)

On May 9, 2005, a hearing was held before an ALJ, during which plaintiff testified and was represented by attorney Dennis W. Fox. (Tr. 157-171.) On June 21, 2005, the ALJ issued a decision unfavorable to plaintiff, and plaintiff filed a Request for Review of Hearing Decision with defendant Agency's Appeals Council. (Tr. 8.) On August 25, 2005, the Appeals Council denied plaintiff's request for review. (Tr. 4-6.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence before the ALJ

### A. Testimony of Plaintiff

At the hearing on May 9, 2005, plaintiff responded to questions from his attorney. During questioning, plaintiff testified that he was born October 29, 1954; is six feet, one inch tall; weighs 165 pounds; and is right-handed. (Tr. 160.) He has never been married, and has one child who was thirty-two years of age at the time of the hearing. (Tr. 161.) Plaintiff testified that he has lived with Mr. Maurice Jones, his minister, for the past fifteen years. Id. Plaintiff testified that he completed the ninth grade in school, was enrolled in special education classes, and

never obtained a GED.[2] (Tr. 161-62.) He testified that he is able to read, but has trouble writing and required assistance completing the social security application forms, and would require assistance completing a job application. Id. Plaintiff has never had a driver's license, but has driven a car. (Tr. 162.) Plaintiff has never been in the military. Id.

In approximately 1973, plaintiff was shot in the leg and head. (Tr. 162-63.) As a result of this incident, plaintiff developed a seizure disorder, and further suffered the amputation of his left leg below the knee. Id. In November 2002, while crossing the street, plaintiff was struck by a car, and his left femur was fractured. (Tr. 163-64.) Following this accident, plaintiff was taken to St. Louis University Hospital where his left femur was repaired and pins and screws were inserted. (Tr. 163-64.) Plaintiff testified that, ever since this procedure, his ability to wear his prosthesis is impaired due to pain in the stump area of his leg. (Tr. 163.) Plaintiff testified that, if he uses a cane or crutch for support, he is able to wear the prosthesis for two to three hours at the most. Id. Plaintiff testified that the orthopedist who re-constructed the broken bone told him that there was nothing that could be done regarding the difficulty he has

---

[2]The record includes correspondence from Ms. Leslie R. Lewis, Executive Director of the Division of Special Education for the St. Louis Public Schools, which indicates that plaintiff never attended special education classes. (Tr. 94.) The record also contains the results of I.Q. tests administered to plaintiff, resulting in scores ranging from 74 to 89. (Tr. 95.)

wearing the prosthesis. (Tr. 164-65.) Plaintiff testified that he has not seen an orthopedist "this year or last year." (Tr. 165.)

Plaintiff testified that he has suffered from seizures since the shooting incident 32 years ago, and suffered a seizure in March of 2005, but was unable to remember whether he suffered one recently. Id. Plaintiff testified that he is unaware of his seizures when they occur, because he loses consciousness. (Tr. 166.) Plaintiff testified that he had recently seen a doctor at St. Louis University Hospital for treatment related to seizures. Id. Plaintiff testified that he obtains medication from the Courtney Clinic, but that he suffers seizures even while taking medication. Id. Plaintiff testified to memory problems, stating that he has trouble remembering things he was told to do for longer than five to ten minutes, and attributed this problem to having been shot in the head. (Tr. 166-67.) Plaintiff has never sought treatment for this condition. (Tr. 167.) Plaintiff has been a recipient of Medicaid for the past five to six years, which funds his treatment and medication at the Courtney Clinic. Id. Plaintiff testified that he has no income, and does not receive food stamps or any other general relief, and that he depends solely upon his minister for support. Id.

Following the shooting incident, plaintiff worked for a labor pool, for Crown Foods as a dishwasher, and at Progressive Manufacturing as a parts assembler. (Tr. 167-68.) Plaintiff was laid off from his job at Progressive Manufacturing. (Tr. 168.)

- 4 -

Plaintiff testified that he would presently be unable to perform a job like that due to the problems with his left leg. Id. Plaintiff testified that he sweeps the floor at his church and performs other such work, but is limited to working for only one hour at a time. (Tr. 168-69.) Plaintiff testified that he wears his prosthetic leg while sweeping, and that he is able to do so because he uses a push broom which gives him a little support. (Tr. 169.) Plaintiff testified that he does not shop or cook, and relies on his minister to do this for him. Id.

Plaintiff testified that he suffers pain in his left leg and back. Id. Plaintiff testified that he believed the pain in his back was caused by wearing his prosthesis. (Tr. 169-70.) Plaintiff takes no pain medication. (Tr. 170.) Plaintiff testified that his sleep was moderately affected by the depression he suffers due to the loss of his mother and his brother. Id. Following the hearing, the ALJ left the record open to await receipt of additional medical records from the Courtney Clinic. (Tr. 159, 170.)

**III. Medical Records**

Records from St. Louis University Hospital indicate that plaintiff was admitted on November 9, 2002 after being struck by a car and fracturing his left femur. (Tr. 99.) It was noted that he

was taking Phenobarbital[3] and Dilantin[4] on a daily basis.  <u>Id.</u>  X-rays of plaintiff's chest were negative, and a CT of plaintiff's abdomen and pelvis performed on November 9, 2002 revealed no acute abdominal or pelvic visceral injury.  (Tr. 111-12.)[5]  Radiological studies of plaintiff's left femur on November 11, 2002 revealed gunshot wound fragments in the left knee area and proximal lower leg area, along with femoral rod and screw placements.  (Tr. 109.)  Plaintiff underwent an open reduction/internal fixation of his left femur on November 11, 2002 by Dr. Robert E. Burdge.  <u>Id.</u>  He was discharged with prescriptions for Tylenol 3,[6] Vistaril,[7] and Colace,[8] advised to continue his Phenobarbital and Dilantin, and instructed to follow up with Dr. Burdge.  <u>Id.</u>

A radiological report from St. Louis University Hospital

---

[3]Phenobarbital is indicated for use in the treatment of epilepsy, anxiety disorders, and insomnia.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682007.html

[4]Dilantin is indicated for use in the treatment of epilepsy and other seizure disorders.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682022.html

[5]The radiological report detailing the results of plaintiff's chest x-ray indicates a date of November 8, 2002.  (Tr. 112.)  This is apparently a typographical error, as the record contains no evidence that plaintiff was hospitalized or seen by a physician on that date.

[6]Tylenol #3 is indicated for use in the treatment of pain.
http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202392.html

[7]Vistaril is used to relieve the itching caused by allergies and to control the nausea and vomiting caused by various conditions, including motion sickness. It is also used for anxiety and to treat the symptoms of alcohol withdrawal.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682866.html

[8]Colace is indicated for use in the treatment of constipation.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601113.html

indicates that plaintiff underwent x-rays of his left femur on February 26, 2003. (Tr. 108.) The study revealed increased callus formation at the distal femur fracture, intramedullary rod and screw placement, and multiple metallic foreign bodies overlying the proximal tibia. Id. The impression was a healing comminuted distal femur fracture. Id.

The record indicates that, on April 30, 2003, plaintiff complained of bilateral knee pain and underwent x-rays of both knees at St. Louis University Hospital. (Tr. 106-107.) Plaintiff's right knee was observed to be normal. (Tr. 106.) The left knee x-ray revealed that plaintiff's fracture was healing. (Tr. 107.)

On December 22, 2003, plaintiff's medical records were reviewed by Robert Taxman, M.D. (Tr. 118.) Dr. Taxman noted plaintiff's history of below-the-knee amputation and subsequent femur fracture, and noted that an x-ray in April 2003 showed healing. Id. Dr. Taxman noted that while plaintiff reported "throbbing" in his left lower extremity, he described no physical limitations, stating that he had no difficulty leaving his home daily, and that he remained away "all day." Id. Dr. Taxman noted that plaintiff had chronic seizure disorder and was medicated with Phenytoin[9] and Phenobarbital, but further noted that plaintiff's file contained no description of the frequency or description of

---

[9]Phenytoin is indicated for use in the treatment of epilepsy and other seizure/convulsive disorders.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682022.html

plaintiff's seizures. Id. Dr. Taxman noted that plaintiff's "claimant forms" failed to mention seizures, and complained instead of memory loss and lack of comprehension. (Tr. 118.) Dr. Taxman concluded that plaintiff's case development was incomplete, and recommended that additional medical evidence be obtained to delineate the functional status of plaintiff's left leg and his seizure disorder. Id.

Records from Forest Park Medical Clinic, Inc., indicate that plaintiff saw Riaz Naseer, M.D., on January 31, 2004 for a consultative examination. (Tr. 113.) Plaintiff wore his prosthesis to the examination. (Tr. 114.) Dr. Naseer noted a history of epilepsy and left leg amputation below the knee following the April 11, 1973 gunshot wounds. (Tr. 113.) Plaintiff reported taking Phenobarbital and Dilantin. Id. Plaintiff complained of pain in his lower back, but did not complain of any pain in his left leg or mention having difficulty wearing his prosthesis. Id. Plaintiff gave no history of nausea, vomiting, blood in his stool, black stool, cough, shortness of breath, pain in his chest or abdomen, and no history of hematuria or dysuria. Id. Plaintiff reported that he did not drink, but that he did smoke. (Tr. 113-14.) Neurological examination revealed normal mental status and speech, but difficulty with ambulation, balancing, and with performing in tandem. (Tr. 114.) Motor examination revealed that plaintiff had no drift to one side or the other, and that his strength in his upper extremities was 5/5, and plaintiff's reflexes were 1-2+ at the

biceps, triceps, brachia radialis, and right knee and ankle.  Id.
Plaintiff reported to Dr. Naseer that his last seizure occurred in
December 2003, and that he had one seizure before 2003.  (Tr. 114-
15.)  Dr. Naseer noted that plaintiff's neurological examination was
normal except for his aforementioned ambulatory problems.  (Tr.
115.)  Dr. Naseer opined that plaintiff could sit, stand and walk,
lift and carry up to 10-15 pounds, and handle small objects easily.
Id.

        The record indicates that a residual functional capacity
("RFC") evaluation was completed on February 25, 2004.  (Tr. 119-
126.)  Therein, it is indicated that plaintiff can occasionally lift
twenty pounds and frequently lift ten; stand, walk and/or sit for
a total of six hours in an eight-hour day; and push and pull without
limitation.  (Tr. 120.)  It was noted that plaintiff's seizure
disorder was not of listing-level severity, and his neurological
examination was normal.  (Tr. 121.)  It was noted that plaintiff had
some difficulty balancing and performing tandem.  Id.  Plaintiff was
limited to "occasionally" climbing, balancing, stooping, kneeling,
crouching, and crawling.     Id.    Plaintiff was assessed no
manipulative, visual, or communicative limitations, but it was noted
that plaintiff should avoid exposure to hazards such as machinery
due to his history of seizures.  (Tr. 122-23.)  It is noted that
plaintiff lived in a "group home", where he took out trash and raked
leaves, but had his meals prepared for him, and it is further noted
that plaintiff complained of pain and throbbing in his left leg.

(Tr. 124.)

Plaintiff visited the emergency room at St. Louis University Hospital on February 10, 2005 with complaints related to sinusitis, mild dehydration, and a back ache. (Tr. 127-34.) The records list Dilantin and Phenobarbital as plaintiff's current medications. (Tr. 132.) Chest x-rays were normal. (Tr. 134.) Plaintiff was diagnosed with sinusitis and mild dehydration, and advised to take Motrin or Tylenol, Doxycycline,[10] and Claritin,[11] and to follow-up in one month. (Tr. 131.)

On March 29, 2005, plaintiff was transported via EMS to the St. Louis University Hospital emergency room following a grand mal seizure. (Tr. 135-152.) It was noted that plaintiff was confused, had a headache and an impaired level of consciousness, and that he further had a history of seizures. (Tr. 138.) It was further noted that plaintiff's seizure had lasted for about one minute, and was witnessed by friends and by EMS personnel. (Tr. 138, 140.) Plaintiff reported that he had been without a supply of Phenobarbital and Dilantin for "a few months." (Tr. 140.) Plaintiff was treated with Phenobarbital and Dilantin, discharged in ambulatory status that same day, instructed to follow up at the Courtney Clinic, and to maintain his anti-seizure medications. (Tr.

---

[10]Doxycycline is indicated for use in the treatment of bacterial infections. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682063.html

[11]Claritin is indicated for use in the treatment of hay fever and allergy-related symptoms. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697038.html

142.)  It should be noted that, during this brief hospital stay, plaintiff also complained of a cough and received a chest x-ray, which revealed no significant changes since the February 10, 2005 study.  (Tr. 144.)

Records from St. Louis ConnectCare, the "Courtney Clinic," indicate that plaintiff was seen on April 18, 2005 for an examination related to his seizure disorder.  (Tr. 153.)  It was noted plaintiff was taking Dilantin and Phenobarbital.  Id. Plaintiff was advised to continue to take Dilantin and Phenobarbital, and return for a follow-up appointment in one month. (Tr. 154.)

## IV.  The ALJ's Decision

The ALJ found that plaintiff had not engaged in substantial gainful activity since January 1, 2001.  (Tr. 15.)  The ALJ further found that plaintiff's history of a left below-the-knee amputation, subsequent left femur fracture, and seizure disorder are considered "severe" based upon 20 C.F.R. § 416.920(c), but that those medically determinable impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation Number 4.  Id.  The ALJ found that plaintiff's allegation of disability was either not fully supported by or was inconsistent with the medical and other evidence of record.  Id.

The ALJ found that plaintiff had the RFC to lift/carry up to 10 pounds frequently and 15 pounds occasionally.  (Tr. 15.)  The

ALJ found that, based upon plaintiff's testimony, plaintiff could stand/walk a total of two to three hours in an eight-hour work day without any assistive device, but could not climb ladders, ropes or scaffolds, should not climb stairs more than occasionally, should not walk on uneven or slippery surfaces, and should not be in the presence of dangerous, unprotected heights or machinery. (Tr. 15-16.) The ALJ further found that plaintiff's past relevant work as an electrical manufacturing assembler did not require the performance of work-related activities precluded by his RFC, citing 20 C.F.R. § 416.965. (Tr. 16.)[12] As a result, the ALJ found that plaintiff was not under a "disability" as defined in the Social Security Act at any time through the date of the decision, citing 20 C.F.R. § 416.920(f).

In so finding, the ALJ specifically noted that, despite plaintiff's limited education, he was able to read and write. (Tr. 13.) Regarding plaintiff's allegation of back pain, the ALJ noted that plaintiff neither sought nor took any pain medication. Id.

_____

[12]The ALJ based part of his decision regarding plaintiff's ability to perform his past relevant work on plaintiff's testimony and prior statements regarding his past work as an electrical manufacturing assembler. Specifically, the ALJ stated: "With this residual functional capacity, the claimant still retains the ability to perform his past work as an electric manufacturing assembler as he testified that he performed it. The claimant has indicated that he performed this job in a seated position and did not lift more than 10 to 15 pounds." (Tr. 15.) The ALJ noted in his decision that plaintiff testified that he performed the electrical parts assembly job while standing, but that plaintiff had previously told a Claims Representative that he performed the job while seated. (Tr. 13.) The undersigned notes that, while plaintiff indeed testified during the hearing that he performed this job while standing, he indicated in a Disability Report form (Tr. 67) and in a Disability Work History Report (Tr. 78) that he performed this job while seated.

The ALJ further noted that plaintiff's work history was "sparse and spotty" and demonstrated a lack of motivation to work.  Id. Regarding plaintiff's medical history, the ALJ noted that plaintiff's seizure condition has been successfully controlled with medication, and that plaintiff had worked as an electric manufacturing laborer and as a dishwasher from 1998 through 1990, subsequent to both his amputation and the onset of his seizure disorder.  Id.

Regarding the motor vehicle accident which caused a fracture in plaintiff's left femur, the ALJ noted as follows:

> The medical evidence does not document any medical event or change in the claimant's medical condition on New Year's Day, 2001, the claimant's alleged disability onset date.  The medical evidence does not document any change until November 9, **2003**, when the claimant was struck by an automobile while he was an intoxicated pedestrian, and this caused a comminuted, supracondylar fracture of the left femur which was repaired with an intramedullary nail and percutaneous screws.  The medical records also mention a repair of the patellar tendon.  On discharge from the hospital on November 13, **2003**, the claimant was given Tylenol No. 3 for pain, and he was instructed to remain non-weightbearing.  The claimant had follow up treatment with the orthopedic surgeon in February and April 2003, at which time X-rays showed that a healing process was occurring, and that there was no cause for concern.  There is no evidence that the claimant sought any further follow up treatment after April 2003, or that the orthopedic surgeon put any permanent restrictions upon his activities.

(Tr. 13-14.) (emphasis added.)[13]

Following this, the ALJ determined that the only other evidence regarding the condition and functionality of plaintiff's left leg  was provided in Dr. Naseer's January 31, 2004 report. (Tr. 14.)  The ALJ noted that Dr. Naseer found that, although plaintiff had some difficulty balancing and performing tandem movements, he had no clinical signs of neurologic abnormalities and could sit, stand and walk, lift and carry 10 to 15 pounds, and handle small objects without difficulty.  (Tr. 14.)  Regarding plaintiff's allegation of back pain, the ALJ noted that the record was void of any evidence that plaintiff had ever sought treatment or taken any medication for back pain.

## V.   Discussion

To be eligible for Supplemental Security Income under the Social Security Act, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001);  Baker v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

---

[13]The record indicates that plaintiff's motor vehicle accident actually occurred in 2002, not 2003.  The undersigned has reviewed the ALJ's statements in the context of the entire record, and concludes that these misstatements are merely typographical, not substantive, errors.  See Quaite v. Barnhart, 312 F. Supp. 2d 1195, 1199-1200 (E.D. Mo. 2004) (whether misstatement is typographical error is to be determined by reading misstatement in context of entire opinion.)  The undersigned further notes that plaintiff does not make note of or challenge these errors.

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the RFC to perform his or her past relevant work. If so, the ALJ finds that the claimant is not disabled. If not, the burden then shifts to the

Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. <u>Pearsall</u>, 274 F.3d at 1217; <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Young v. Shalala</u>, 52 F.3d 200 (8th Cir. 1995), <u>citing</u> <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ;

2.    The plaintiff's vocational factors;

3.    The medical evidence from treating and consulting physicians;

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.    Any corroboration by third parties of the plaintiff's impairments;

6.    The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

<u>Stewart v. Secretary of Health & Human Services</u>, 957 F.2d 581, 585–86 (8th Cir. 1992), <u>quoting</u> <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." <u>Groeper v. Sullivan</u>, 932 F.2d 1234, 1237 (8th Cir. 1991); <u>see also</u> <u>Briggs</u>, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. <u>Briggs</u>, 139 F.3d at 608; <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992), <u>citing</u> <u>Cruse</u>, 867 F.2d at 1184.

In the case at bar, Plaintiff claims that the ALJ's decision is not supported by substantial evidence because: (1) at the second step of the regulatory framework, the ALJ failed to consider plaintiff's medically determinable impairment of a "borderline" I.Q. test score of 74, recorded in 1971; (2) the ALJ failed to fully and fairly develop the record and articulate a legally sufficient rationale for his findings related to plaintiff's RFC; and (3) the ALJ's finding that plaintiff was capable of performing his past relevant work was merely conclusory and therefore legally insufficient. The undersigned will first address plaintiff's argument concerning the ALJ's findings at step two of the regulatory framework.

A.    <u>The ALJ's Step Two Findings</u>

At step two of the sequential evaluation, the ALJ found

that plaintiff had the medically determinable impairments of status post amputation below the left knee and seizure disorder.[14]  (Tr. 15.)  Plaintiff argues that these findings are not supported by substantial evidence on the record as a whole because the ALJ failed to properly consider the medically determinable impairment of plaintiff's "borderline" I.Q. score of 74, recorded in his school records.  In response, the Commissioner argues that the ALJ was not bound to include plaintiff's I.Q. in his analysis both because it is inconsistent with the record, and because plaintiff did not claim his low I.Q. as a disabling impairment.

The Commissioner's Regulations provide that the ALJ will consider impairments which are raised by the claimant, and about which the record contains evidence.  20 C.F.R. § 416.912(a).  Although an I.Q. test can be "useful in determining whether an applicant has a mental impairment . . . other information in the record which indicates the individual's ability to function can be used to discredit the lone I.Q. score."  Holland v. Apfel, 153 F.3d 620, 622 (8th Cir. 1998).  The ALJ is not required to accept a claimant's I.Q. scores, and may reject scores that are inconsistent with the record.  Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998) (citing Mackey v. Shalala, 47 F.3d 951, 953 (8th Cir. 1995)).

_____

[14]The findings required at step two are as follows:  "At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in  416.909, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (See paragraph (c) of this section.)  20 C.F.R. § 416.920(a)(4)(ii).

The ALJ's failure to consider plaintiff's 1971 I.Q. score of 74 was not error. Although the ALJ did not specifically refer to plaintiff's I.Q. test scores, that does not mean that the scores were not considered. <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th Cir. 1998) (An ALJ need not discuss every piece of evidence submitted, and a failure to specifically refer to evidence does not mean it was not considered). The record indicates that plaintiff was administered approximately four I.Q. tests by the St. Louis Public Schools, and that he achieved scores ranging from a low of 74 to a high of 89. (Tr. 95.) The record also indicates that, contrary to his testimony during the hearing, plaintiff received no special education services while in school. (Tr. 94; 162.) The record further indicates that plaintiff did not allege a disabling mental disorder in his application for benefits, and testified during the hearing that he was able to read. (Tr. 57-58; 161.) Because plaintiff's I.Q. score of 74 is inconsistent with his other I.Q. test scores and with the other evidence of record, the ALJ did not err in failing to consider it at step two of his evaluation. <u>Clark</u>, 141 F.3d at 1255, (citing <u>Mackey</u>, 47 F.3d at 953.)

B.  <u>Residual Functional Capacity</u>

Plaintiff also challenges the ALJ's assessment of his RFC. Specifically, plaintiff contends that the ALJ failed to fully and fairly develop the record and articulate a legally sufficient rationale with respect to his RFC findings, and refers this Court to Dr. Taxman's December 22, 2003 opinion that the record contained

insufficient information to make an informed decision regarding the functional status of plaintiff's left leg and the current status of his seizure disorder. Plaintiff does not challenge the ALJ's credibility findings. In response, the Commissioner argues that substantial evidence supports the ALJ's decision. Following a review of the record, the undersigned concludes that the ALJ's decision concerning plaintiff's RFC is supported by substantial evidence on the record as a whole.

Residual functional capacity is what a claimant can do despite his limitations. 20 C.F.R. § 404.1545, <u>Lauer v. Apfel</u>, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995); <u>Goff v. Barnhart</u>, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a). A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. <u>Id.</u>; <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711-12 (8th Cir. 2001); <u>Lauer</u>, 245 F.3d at 703-04; <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. <u>Hutsell</u>, 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all relevant

evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. <u>Pearsall</u>, 274 F.3d at 1217 (8th Cir. 2001); <u>McKinney</u>, 228 F.3d at 863. The claimant bears the burden of establishing his RFC. <u>Goff</u>, 421 F.3d at 790.

It is well-settled law that an ALJ is required to fully and fairly develop the record even when, as in this case, a claimant is represented by counsel. <u>Nevland</u>, 204 F.3d 853 (citing <u>Warner v. Heckler</u>, 722 F.2d 428, 431 (8th Cir. 1983)). Included in this duty is the responsibility of ensuring that the record includes evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue. <u>Nevland</u>, 204 F.3d at 858; <u>see</u> <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1071-72 (8th Cir. 2004). A reviewing court has the duty of determining whether the record presents medical evidence of the claimant's RFC at the time of the hearing. <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995). Unless the record contains such evidence, the ALJ's decision cannot be said to be supported by substantial evidence. <u>Id.</u>

For his RFC findings related to plaintiff's left leg, the ALJ noted that radiological reports following plaintiff's left femur fracture and repair indicated that the fracture was healing, and that there was no cause for concern. The ALJ noted that he found it significant that plaintiff failed to seek orthopedic treatment after April 2003, did not seek treatment to address his alleged difficulty wearing his prosthesis, and failed to mention any

prosthesis difficulties to his physicians.  An ALJ is entitled to find that a claimant's failure to seek significant medical treatment is inconsistent with a finding of disability.  Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir. 1987); Edwards v. Secretary of Health and Human Services, 809 F.2d 506, 508 (8th Cir. 1987); see also Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (a claimant's failure to seek medical treatment for alleged impairments contradicts subjective complaints of disabling conditions and supports the ALJ's decision to deny benefits).  The ALJ further noted that plaintiff never took any  pain medication, or that he had been advised by an orthopedist to restrict his activities.  Haynes v. Shalala, 26 F.3d 812, 814 (8th Cir. 1994) (a lack of strong pain medication is inconsistent with subjective complaints of disabling pain).  The ALJ further considered plaintiff's January 31, 2004 consultative examination with Dr. Naseer, specifically noting that plaintiff wore his prosthesis to this examination and that, other than apparent difficulty in balancing and performing tandem movements, Dr. Naseer found that plaintiff's gait and station were normal.  Id.  The ALJ finally noted Dr. Naseer's opinion that plaintiff could sit, stand, and walk, and carry up to 10 to 15 pounds.  Id.

   For his RFC findings related to plaintiff's seizure disorder, the ALJ noted that both the March 29, 2005 emergency room treatment records and plaintiff's own testimony indicated that the seizure occurred because plaintiff had not been taking his anti-seizure medications, Dilantin and Phenobarbital.  The ALJ further

noted Dr. Naseer's findings that plaintiff's neurological examination was normal, that plaintiff continued to receive follow-up treatment for his seizure disorder, was currently taking his medications, and finally that the medical evidence documented no other seizures. The ALJ then noted that the only conclusion that could be drawn was that plaintiff's seizure disorder was effectively controlled with medication that caused no side effects. Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001)(impairments controllable or amenable to treatment do not support a finding of total disability).

Finally, regarding plaintiff's allegation of disabling back pain, the ALJ noted that plaintiff never sought any medical treatment for back pain, was never diagnosed with any physiologic abnormality that could be expected to produce back pain, and that plaintiff was not taking pain medications. As noted, supra, the ALJ is entitled to consider a plaintiff's failure to seek medical treatment and/or take pain medication as factors weighing against a finding of disability. Gwathney, 104 F.3d at 1045; Haynes, 26 F.3d at 814; Benskin, 830 F.2d at 884; Edwards, 809 F.2d at 508.

In support of his contention that the ALJ failed to fully and fairly develop the record with regard to his RFC findings, plaintiff notes Dr. Taxman's December 22, 2003 report, discussed supra, in which the doctor stated he believed plaintiff's case development was incomplete, and that further medical evidence was necessary to delineate the functional status of plaintiff's left leg

and his seizure disorder. Plaintiff argues that the ALJ's failure to consider Dr. Taxman's report and follow its recommendations supports his conclusion that the ALJ failed to fully and fairly develop the record. Although the ALJ did not specifically reference Dr. Taxman's report, this does not mean that he failed to consider it. Black, 143 F.3d at 386 (An ALJ need not discuss every piece of evidence submitted, and a failure to specifically refer to evidence does not mean it was not considered).

Dr. Taxman's statement that "case development is incomplete" is not binding upon the ALJ. First, it is not "medical opinion evidence," because Dr. Taxman does not offer an opinion regarding plaintiff's medical condition which could be said to be supported by references to "medically acceptable clinical and laboratory diagnostic techniques." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). Second, Dr. Taxman's opinion regarding the legal issue of whether plaintiff's case is ripe for adjudication is not binding upon the ALJ. See Cruze v. Chater, 85 F.3d 1320, 1325 (8th Cir. 1996) (physician's opinion that the plaintiff qualified for disability benefits was not binding on the ALJ because it was not a medical opinion, but an opinion on the application of a statute, "a task assigned solely to the discretion of the Secretary.")

Finally, as the Commissioner notes, the record was indeed further developed beyond Dr. Taxman's report with medical evidence which, as discussed, supra, addresses the impairments at issue in

the instant case. The undersigned notes that the ALJ indeed relied heavily upon the report of Dr. Naseer, a consulting physician, and that normally, the opinion of a consulting physician who examines a claimant only once or not at all does not provide substantial evidence to support the ALJ's decision. Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998). In the instant case, however, the ALJ did not rely solely upon Dr. Naseer's opinion to reach his conclusions, but rather relied upon it as part of the record as a whole which, as discussed above, provides substantial support for his findings. Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004) (ALJ did not err in relying upon the opinion of a non-examining, consulting physician when he relied upon it as one part of the record which, as a whole, supported the ALJ's findings). The ALJ was under no duty to produce additional medical evidence, as the record contained sufficient evidence to support the ALJ's RFC findings. See Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994) (The need for medical evidence does not require the Commissioner to produce additional evidence not already within the record, unless the record is void of other evidence which provides a sufficient basis for the ALJ's decision).

"Reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995) (citing Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993). Plaintiff has made no such showing. The ALJ fulfilled his duty to fully and fairly develop the

record, and the RFC findings are supported by substantial evidence on the record as a whole.

C.   Past Relevant Work

Plaintiff finally argues that the ALJ erred in concluding that plaintiff could perform his past relevant work inasmuch as such conclusion was based on insufficient and conflicting evidence. Specifically, plaintiff contends that the ALJ based his finding in part on plaintiff's indication that he performed the job while seated, when in fact plaintiff testified during the hearing that he performed the job while standing.[15]

If a claimant can perform his past relevant work, a finding of non-disability is required. Johnston, 42 F.3d 448, 452 (8th Cir. 1994). However, when an ALJ finds a claimant to be able to return to his past relevant work,

> [the] ALJ has an obligation to "fully investigate and make explicit findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant [him]self is capable of doing before he determines that [he] is able to perform [his] past relevant work."

Groeper v. Sullivan, 932 F.2d 1234, 1238 (8th Cir. 1991) (quoting Nimick v. Secretary of Health & Human Services, 887 F.2d 864, 866 (8th Cir. 1989) (emphasis in original)).

An ALJ may not make a conclusory determination that a claimant can

---

[15]As discussed, supra, the undersigned notes two instances in the record in which plaintiff indicated that he performed his past relevant work while seated: In a Disability Report form (Tr. 67) and in a Work History Report form.  (Tr. 78.)

perform his past relevant work.  Instead,

> [t]he ALJ must specifically set forth the
> claimant's limitations, both physical and
> mental, and determine how those limitations
> affect the claimant's residual functional
> capacity.  The ALJ must also make explicit
> findings regarding the actual physical and
> mental demands of the claimant's past work.
> Then, the ALJ should compare the claimant's
> residual functional capacity with the actual
> demands of the past work to determine whether
> the claimant is capable of performing the
> relevant tasks.

Groeper, 932 F.2d at 1238-39.

If the record contains substantial evidence that a claimant can
perform past work, failure of the ALJ to develop the record as to
claimant's past relevant work in full detail does not require
remand.  Battles v. Sullivan, 902 F.2d 657, 659 (8th Cir. 1990).

In the instant case, the ALJ determined plaintiff to be able
to return to his past relevant work as an electric manufacturing
assembler.  The ALJ noted that plaintiff had previously indicated
that he performed this job in a seated position and did not lift
more than 10 to 15 pounds, and determined that this description,
coupled with plaintiff's physical limitations, i.e., his lifting
restrictions and his inability to stand for more than two to three
hours per day, would not preclude plaintiff from performing the
physical demands of the job.  Although plaintiff is indeed correct
that he testified during the hearing that he performed this work
while standing, the ALJ chose to rely instead upon plaintiff's

previous statements in the record that he performed the job while seated. It is the duty of the ALJ, not the courts, to evaluate the evidence, resolve any material conflicts, and determine the case accordingly. Driggins v. Bowen, 791 F.2d 121, 124 (8th Cir. 1986); Weber v. Harris, 640 F.2d 176, 178 (8th Cir. 1981). Here, the ALJ noted the discrepancy between plaintiff's prior statements and his testimony, and chose to credit plaintiff's statements that he performed his past relevant work while seated. Resolution of conflicts in the evidence are the province of the Secretary, not this Court. See Driggins, 791 F.2d at 124. The ALJ further credited plaintiff's statement that he lifted no more than 15 pounds in this job, and found this to be consistent with Dr. Naseer's opinion that plaintiff could lift 10 to 15 pounds.

Plaintiff further contends that the ALJ erroneously failed to consider his mental impairments in determining that plaintiff could perform his past relevant work. However, as discussed, supra, because plaintiff did not allege, either in his claim or during the hearing, any mental impairment as a basis for disability, it was not error for the ALJ not to address the mental demands of plaintiff's past relevant work. Rose v. Apfel, 181 F.3d 943, 945 (8th Cir. 1999); cf. Sullins v. Shalala, 25 F.3d 601, 604 (8th Cir. 1994) (ALJ did not err in failing to include hypothetical question about alleged mental impairments when claimant did not allege disabling mental impairment in application, nor offered such impairment as basis for disability at hearing).

The ALJ's determination here that plaintiff can return to his past work is more than a conclusory statement and is based on substantial evidence on the record as a whole. The ALJ specifically set forth plaintiff's limitations and the demands of plaintiff's past work as he had previously described them, and determined plaintiff would be able to return to his past relevant work. Therefore, the ALJ satisfied his obligation as set out in <u>Groeper</u>.

Because substantial evidence on the record as a whole supports the ALJ's conclusion that plaintiff can perform his past relevant work, the plaintiff has failed to meet his burden to show that he has a "medically determinable impairment which precludes performance of previous work." <u>Turpin v. Bowen</u>, 813 F.2d 165, 170 (8th Cir. 1987). Therefore, plaintiff has failed to meet his burden of establishing a disability, and the decision of the Commissioner must be affirmed. <u>See</u> <u>Johnston</u>, 42 F.3d at 452.

Accordingly, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed and that plaintiff's complaint be dismissed with prejudice.

The parties are advised that they have until March 12, 2007, to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357

(8th Cir. 1990).

_____
UNITED STATES MAGISTRATE JUDGE

Dated this 1st day of March, 2007.